UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| **MARK MEADOR** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 5:22cv00043-RWS-JBB** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION** | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

On April 1, 2022, Mark Meador ("Plaintiff") initiated this civil action pursuant to the Social Security Act ("The Act"), Section 405(g) for judicial review of the Commissioner's denial of Plaintiff's applications for Social Security benefits. The Court is of the opinion the above-entitled social security action should be **AFFIRMED.**

## HISTORY OF THE CASE

On August 6, 2019, Plaintiff protectively filed an application for a period of disability and disability insurance benefits as well as an application for supplemental security income benefits, claiming disability beginning September 1, 2018, due to manic depressive, schizoaffective disorder, Bipolar I, Hepatitis C, high blood pressure, shortness of breath, and arthritis (Dkt. No. 9, "Tr." at 190-96, 244). The Commissioner denied Plaintiff's applications initially and on reconsideration (Tr. 12). Plaintiff subsequently requested a hearing, which the Administrative Law Judge ("ALJ") held on September 10, 2020 (Tr. 30-54). After reviewing the evidence and hearing testimony, the ALJ issued a decision on November 1, 2021, finding Plaintiff was not disabled under the Act (Tr. 9-24). On February 28, 2022, the Appeals Council denied review of the ALJ's decision (Tr. 1-6). Plaintiff filed this action pursuant to 42 U.S.C. § 405(g), appealing the Commissioner's final decision.

1

## STATEMENT OF THE FACTS

### Age, education, and work experience

Plaintiff was born March 8, 1960 and was sixty years of age at the time of the hearing (Tr. 35). Plaintiff has a GED, a vocational license to cut hair, and past work experience as a hairdresser. (Tr. 37).

### Medical record evidence

On July 23, 2016, Plaintiff presented to CHRISTUS St. Michael Health System with suicidal thoughts and suicidal ideation (Tr. 708-18). Plaintiff represented his mental state upon admission as follows:

> . . . [states] 'I have been using drugs (crack and cocaine) and I am just getting to the point where I am tired of it all … tired of life', [reports] suicidal ideations – no clear plan, [states] 'I just want to keep on using drugs until I …' [patient] speaking soft/depressed mood … also [reports] visual hallucinations.

(Tr. 710) (internal capitalization removed).

The next day, Plaintiff had a mental screening at JSA Health (Tr. 719-36). Plaintiff reported a history of cocaine dependence and that he had been clean for twelve years until he relapsed four months prior (Tr. 719). Plaintiff further reported a history of anxiety and insomnia, even when he was off drugs (Tr. 719). Plaintiff understood his issues were "primarily substance addiction," but he wanted help with his anxiety and insomnia and also indicated he did not want to take any more Valium (Tr. 719).

On mental status examination, Plaintiff's mood was anxious, insight and judgement were limited, impulse control was impaired, but Plaintiff's thought processes were logical, his recent and remote memory were "grossly intact," and he had no delusions or hallucinations (Tr. 724). Although Plaintiff had "specific thoughts" of suicidal ideation, he denied "intent." (Tr. 724). Plaintiff was oriented to person, place, time, and situation (Tr. 724). Plaintiff was diagnosed with

"major depressive disorder, recurrent severe without psychotic features" and "cocaine use disorder, severe, dependence." (Tr. 725).

Plaintiff presented to CHRISTUS St. Michael Health System on January 2, 2018, with a chief complaint of drug addiction withdrawals (Tr. 383-402). He stated he had been using drugs daily for the past four months and had used cocaine and alcohol the night before (Tr. 384). Plaintiff also reported having suicidal thoughts related to his drug addiction, but he did not actually want to kill himself (Tr. 384). Plaintiff reported experiencing chest pain, chills, "throbbing pain," cough, vomiting, diarrhea, sore throat, and runny nose for one month (Tr. 384).

Plaintiff's examination and labs were "unremarkable," and Plaintiff was provided resources for drug addiction recovery (Tr. 387-88). Plaintiff was diagnosed with drug addiction and myalgia (Tr. 388). After being referred to Genesis PrimeCare, Plaintiff was released in stable condition (Tr. 388).

Plaintiff presented to CHRISTUS St. Michael Health System's Emergency Room on February 5, 2018, claiming he had an ulcer (Tr. 365-82). Plaintiff's chief complaint was constant left abdominal pain for the past six months which had slightly improved after becoming sober from drugs about one month prior (Tr. 366). Plaintiff described the pain as moderate and "burning." (Tr. 366-67). Plaintiff reported worsening nausea over the past few days (Tr. 366). Plaintiff indicated a history of smoking, whiskey consumption, cocaine, and marijuana use (Tr. 367). Plaintiff also claimed he had a history of Hepatitis C and was not taking any medication for it (Tr. 366). Plaintiff further reported suffering from anxiety and requested medication (Tr. 366).

Upon revaluation about seven and a half hours later, Plaintiff's condition had improved, and he indicated he was "feeling better." (Tr. 368). The impressions were gastroesophageal reflux

disease (GERD) and hypertension (Tr. 369). Plaintiff was released with instructions to follow up with his primary doctor (Tr. 369).

Plaintiff presented to Community Healthcore on March 2, 2018, for counseling (Tr. 557). Plaintiff stated that he "needed counseling and to be put back on his medication." (Tr. 557). Plaintiff appeared verbally aggressive at the beginning of the intake but denied being under the influence of methamphetamines at the time (Tr. 557). Angela Bross, LPC, was unable to make a diagnosis due to Plaintiff's behavior (Tr. 557). Plaintiff left the appointment after thirty minutes (Tr. 557).

Plaintiff presented to Genesis PrimeCare on March 8, 2018, to establish care following his February 5, 2018 ER visit (Tr. 439-42). Plaintiff reported some stomach ulcer issues, troubles urinating, fatigue, and problems with anxiety and depression (Tr. 439). Plaintiff stated he had been diagnosed with Hepatitis C in 1998 but had not been treated (Tr. 439). On examination, Plaintiff's general appearance was "pleasant, well nourished, well developed, in no acute distress, well hydrated, comfortable, calm and relaxed, cooperative." (Tr. 439). Valerie A. Smith, D.O., assessed Plaintiff with chronic Hepatitis C without hepatic coma, history of drug use, essential hypertension, urinary hesitancy, and nocturia (Tr. 440). Dr. Smith recommended the following: ECHO program for Hepatitis C, thirty minutes of cardiovascular exercise for the hypertension, a urology reference for the urinary hesitancy, and counseling for the drug use (Tr. 440-41).

Plaintiff returned to Genesis PrimeCare on March 16, 2018, for lab testing (Tr. 432-38). Plaintiff reported he had not seen the referred urologist at Collom and Carney because he could "not be seen" there (Tr. 432). Plaintiff claimed he had a lot of anxiety and did not sleep well (Tr. 432). On examination, Plaintiff's general appearance was "pleasant . . . calm and relaxed and cooperative." (Tr. 435). Plaintiff's assessments included chronic Hepatitis C, history of drug use,

essential hypertension, urinary hesitancy, and nocturia, as well as anxiety, major depressive disorder, vitamin D deficiency, and BMI between 29 and 29.9 (Tr. 435-36). Plaintiff's prescription for Lisinopril was increased for his hypertension, he was prescribed Cholecalciferol for his vitamin D deficiency, his urology referral was changed to a different practice, and he was referred to Behavioral Health for his anxiety and depression-related issues (Tr. 436-37).

Plaintiff reported to Genesis PrimeCare on May 2, 2018, for a checkup of his Hepatitis C (Tr. 429-31). Again, Plaintiff's general appearance was noted as "pleasant . . . calm and relaxed and cooperative" with no major medical issues (Tr. 429). Assessments included chronic Hepatitis C without hepatic coma, essential hypertension, and a BMI between 29 and 29.9 (Tr. 429-30). Plaintiff was scheduled for an ECHO panel on May 14, 2018 (Tr. 430). Plaintiff's hypertension medicine was increased again (Tr. 430). Plaintiff was instructed to follow up as needed (Tr. 430).

Plaintiff presented to Genesis PrimeCare on July 24, 2018, with a complaint of shortness of breath upon exertion (Tr. 425- 28). Plaintiff reported shortness of breath for the "last few days" and that the difficulty breathing had interfered with his part time work as a hair stylist (Tr. 425). Plaintiff represented that he had taken down some ceiling tiles within the past few months that may have had asbestos in them, and he painted motorcycles about two times a week (sometimes without a mask) (Tr. 425).

Although Plaintiff's general appearance was "pleasant . . . calm and relaxed and cooperative," Dr. Smith noted Plaintiff had a mild pallor (Tr. 425). Plaintiff had an echocardiogram due to concern of exposure to aerosolized paints and possible asbestos (Tr. 426). Assessments included dyspnea on exertion, shortness of breath, chronic Hepatitis C without hepatic coma, and a BMI of 30 to 30.9 (Tr. 426). Plaintiff was started on Ventolin, as needed, for the dyspnea on exertion (Tr. 426).

Plaintiff presented to Parkland inpatient/outpatient rehabilitation services on January 17, 2019, for a physical examination (Tr. 404-10). Plaintiff complained of Hepatitis C, hypertension, and feet pain (Tr. 406). Based on a physical and mental examination, Plaintiff was diagnosed with bilateral foot pain, corn and callosities, history of Hepatitis C, mood disorder, and colon cancer screening (Tr. 405). Plaintiff received a referral for his foot-related diagnoses, approval for Hepatitis C treatment in Texarkana pending a follow up with Genesis PrimeCare, and a referral to Behavioral Health for his mood disorder (Tr. 408).

Plaintiff presented to Genesis PrimeCare on August 23, 2019, for a check up on his Hepatitis C, hypertension, and mental health issues (Tr. 421-24). A depression screening indicated minimal depression (Tr. 421). On examination, Stephanie K. Ford, FNPC, noted Plaintiff's general appearance as "pleasant . . . comfortable, calm and relaxed and cooperative" as well as "obese." (Tr. 422). Plaintiff's assessment indicated essential hypertension, BMI 32.0 – 32.9, and chronic Hepatitis C without hepatic coma (Tr. 422). Plaintiff was instructed to restart his Lisinopril for the hypertension. He was referred to University Health Gastroenterology for the Hepatitis C and provided counseling for BMI management (423-24).

Plaintiff presented to Ochsner LSU Health Shreveport on September 11, 2019, for an initial evaluation regarding his Hepatitis C (Tr. 457-66). Plaintiff claimed the Hepatitis C risk factors first became present through IV drug use when Plaintiff was eighteen years old and through tattoos, first around age eleven (Tr. 461). Plaintiff reported having had no prior treatment for Hepatitis C and no history of liver disease (Tr. 461). Blood tests and a FibroScan indicated Plaintiff had chronic Hepatitis C without hepatic coma, fibrosis stage F2, and steatosis grade S3 (Tr. 458, 64).

Plaintiff returned to Ochsner LSU Health Shreveport on September 27, 2019, for a follow up regarding Hepatitis C (Tr. 477-84). Aimie A. Pohl, N.P., discussed treatment options to prevent

progression of liver disease (Tr. 483). Plaintiff was also informed of the limitations of acid suppressant medications and the potential need for acid suppression therapy (Tr. 483). Plaintiff was instructed to call when his medication arrived and to follow up in four weeks (Tr. 483). Plaintiff returned for his four week follow up on December 2, 2019, at which time he denied side effects of the current therapy (Tr. 589).

The record indicates Plaintiff presented to Genesis PrimeCare on December 4, 2019, for "short of breath with any little thing," anxiety issues, hands going numb off and on, a left-hand injury, and Hepatitis C (Tr. 637-40). On examination, Plaintiff's general appearance was obese (Tr. 637). Plaintiff's assessments included shortness of breath on exertion, chronic fatigue, orthopnea, bilateral hand numbness, and a BMI between 32 – 32.9 (Tr. 638). Plaintiff was instructed to return the next day for lab work and imaging and was prescribed Gabapentin for the hand numbness (Tr. 638-39).

Plaintiff returned on December 20, 2019, for a pulmonary function test and radiology scans (Tr. 641-46). Plaintiff's pulmonary function results indicated a moderate obstructive lung defect, a mild diffusion impairment, and significant bronchodilator response (Tr. 641). Plaintiff's radiology chest scans were compared to previous scans from June 25, 2016, and January 2, 2018 (Tr. 642). Results indicated no change of the shrapnel within the posterior thoracic wall that overlies the right midlung and base (Tr. 642). Minimal bibasilar atelectasis infiltrate was further noted (Tr. 642).

The record indicates Plaintiff received thirty-seven counseling sessions from Community Healthcore between the dates of July 24, 2019, and July 6, 2021 (Tr. 558-69, 690-707, 818-842, 875-83, 919-928, 981-1012, 1044-45). Plaintiff's referral indicated a history of schizophrenia (Tr. 558). Plaintiff also reported additional symptoms of paranoia, anxiety, isolation, difficulty

concentrating, anger, aggression, and mood swings (Tr. 558). Plaintiff stated the relevant background for his mental health issues were multiple instances of sexual molestation during adolescence and a failed suicide attempt in 1981 via gunshot (Tr. 558).

Plaintiff met with Community Healthcore starting July 26, 2019 (Tr. 560). On July 31, 2019, Plaintiff identified his issues and goals as follows: he wanted to get disability, he was unable to work outside, and he had obsessive/compulsive issues (Tr. 561-62). At that time, Plaintiff commented on the effectiveness of his medicine, stating "my medicine makes a huge difference" and "the medication helps me concentrate better." (Tr. 561-62). At his August 7, 2019 appointment, Plaintiff was smiling and appeared to be in good spirits (Tr. 563). Plaintiff was positive, stating "you guys are efficient I appreciate your help." (Tr. 563).

On August 21, 2019, Plaintiff reported increased agitation, stating "sometimes I have to take a Seroquel during the day, . . . I get so irritable and overwhelmed, hollering and cussing at my family, I have arguments in my mind and start thinking about things." (Tr. 565-66). Plaintiff indicated on September 25, 2019, that he was starting to get increasingly stressed about his financial situation (Tr. 569). In response, Plaintiff was taught safe coping strategies to better manage his mood relating to his stress (Tr. 569). Plaintiff indicated the stress persisted through his October 2, 2019 and October 9, 2019 sessions (Tr. 690-691). However, Plaintiff was otherwise "smiling and well-groomed" for both sessions (Tr. 690-691). Plaintiff's mood steadily improved through his sessions, with him stating as follows: "things are good since I got my medicine" (October 30, 2019); "right now I am not anxious or having any problems" (October 30, 2019); and "my medicine makes a world of difference, my life is so much better than it was." (November 20, 2019) (Tr. 695-700).

On January 13, 2020, Plaintiff was frustrated about issues he claimed to have with his memory (Tr. 706-07). Otherwise, Plaintiff presented as "smiling and well groomed" and denied increased symptoms. (Tr. 706-07). After this appointment, Plaintiff received counseling over phone conversations due to the travel limitations from the Coronavirus (Tr. 875-83).

Plaintiff's counseling sessions through the majority of 2020 were largely unremarkable with little notation about his mental state (Tr. 875-83). On August 24, 2020, Plaintiff indicated that he struggled with anger, but that he was utilizing coping mechanisms to calm himself down (Tr. 884). On September 28, 2020, Plaintiff reported that his depressive symptoms were "up and down." (Tr. 923). On December 22, 2020, Plaintiff gave a more detailed update on his progress stating, "everything is going alright. I still have a lot of anxiety. I deal with that every day." (Tr. 982-83). Plaintiff presented with a "happy mood" during the session, stated everything was going well in his life expect for the anxiety, and he was "eager to work towards his recovery goals and participate in treatment." (Tr. 982). Plaintiff stated he wanted to get disability benefits approved so he could "pay off probation and finish remodeling [his] house." (Tr. 982).

Plaintiff indicated on February 22, 2021 that his mood had improved such that he could tolerate outside setbacks, stating as follows: "I'm doing well right now. I'm not happy about the snowstorm we had because I haven't had water in a week, but other than that, things are pretty good." (Tr. 992-93). This pattern of improved behavior was seen throughout subsequent sessions with no notations of anxiety or depression until his last session on July 6, 2021 (Tr. 1044-45). Plaintiff indicated in his last session that he was sometimes "real anxious," and he expressed a desire have his medications changed again (Tr. 1044).

On June 30, 2021, Plaintiff had a psychological evaluation by James P. David Psy.D. (Tr. 1013-23). Plaintiff alleged major depressive disorder, bipolar, and schizoaffective disorder (Tr.

1013). Plaintiff supported these conditions by stating, "they are going to change my medication here soon because I've been hearing things and I don't like being around anyone because there are always people talking about me. I find it hard to get along with anyone. I don't get along with my family. I always feel like something's going on." (Tr. 1013-14). Plaintiff reported feeling "internally distracted and forgetful," and he described anger, irritability, and paranoia which disrupted all of his relationships (Tr. 1014).

In the mental status examination, Plaintiff's thought processes were "generally logical, coherent and relevant without overt signs of major thought disorder, but some reported history of paranoia and hallucinations." (Tr. 1015). Plaintiff reported auditory hallucinations, a history of suicidal thinking since childhood, and one prior serious suicide attempt (Tr. 1016). Plaintiff presented with depressed mood and dysthymic affect with low average intelligence, but he was able to calculate mental math accurately and appeared to have some, limited insight (Tr. 1016). After testing, Plaintiff scored average in quantitative reasoning, borderline delayed for nonverbal IQ and working memory, and low average in all other areas (Tr. 1017).

Plaintiff was diagnosed with schizoaffective disorder, bipolar type; post-traumatic stress disorder; severe cocaine use disorder in remission three years; panic disorder with agoraphobia; and specific learning disorder with impairment in written language (Tr. 1018). Dr. David noted Plaintiff's symptoms were "quite severe, persistent, and have had only limited response to medication management." (Tr. 1019). According to Dr. David, Plaintiff's level of paranoia and psychosis severely impair him in any work environment, noting Plaintiff rarely left the house dur to panic and agoraphobia (Tr. 1019). Regarding functional capacity, Dr. David opined Plaintiff had moderate impairment in his ability to understand, carry out, and remember instructions; moderate to severe impairment in his ability to sustain concentration and persist in work related

activities at a reasonable pace; and a severe impairment in his ability to (1) maintain effective social interaction on a consistent and independent basis with supervisors, coworkers and the public and (2) deal with normal pressure in a competitive work setting (Tr. 1019).

Dr. David completed a Medical Source Statement of Ability to do Work Related Activities (Mental) that showed marked limitations in Plaintiff's ability to: (1) understand and remember computer instructions; (2) carry out complex instructions; and (3) make judgments on complex work-related decisions; (4) interact appropriately with the public and co-workers; and (5) respond appropriately to usual work situations and to changes in a routine work setting (Tr. 1020-21). Dr. David opined Plaintiff has an extreme limitation in his ability to interact appropriately with supervisors (Tr. 1021). According to Dr. David, Plaintiff's ongoing psychosis/paranoia impairs his judgment; he scores low on working memory and has a hard time following through on complex tasks; he now shows signs of agoraphobia and panic attacks; and he cannot tolerate working with others (Tr. 1020-21).

## THE HEARING

### *Plaintiff's testimony*

During the hearing, Plaintiff testified he has a GED and last worked in 2018 (Tr. 35-37). In addition to his GED, Plaintiff stated he has a vocational license to cut hair (Tr. 37).  Plaintiff indicated that he is seeking social security disability because of hand tremors from medications and having a "hard time around other people." (Tr. 38-39). Plaintiff stated these issues make him "not . . . comfortable leaving his house" and prevent him from working (Tr. 38). Plaintiff further elaborated that his issues are specifically related to his history of depression, schizoaffective episodes, and short-term memory problems (Tr. 40). Plaintiff stated he was hospitalized for six months approximately one year prior due to his depression and schizoaffective episodes, and he

has been "been doing what [he] was supposed to do since [he] left there." (Tr. 40). When asked about treatment for his conditions, Plaintiff indicated that his regular therapy meetings with Community Healthcore have "really helped [him] a lot" and that they are "good people." (Tr. 38). Plaintiff clarified that he likes to utilize talking to his counselors "as much as possible" for support with his mental health (Tr. 41). When Plaintiff was asked about his counseling by his own attorney, he specifically indicated that Diane Thomas was the best counselor he has ever had (Tr. 44-45).

Plaintiff stated he is scatter-brained and has anxiety, along with trouble paying attention, concentrating, and focusing (Tr. 40-41). Plaintiff has a difficult time finishing tasks and making decisions (Tr. 41). Plaintiff also stated he has a "real hot temper," noting his extended amount of time in prison (Tr. 42). Plaintiff stated he cannot shake the feeling that everyone is trying to "find the worst in [him]" or "wear [him] down," especially considering his past (Tr. 42).

When asked about his routine household activities, Plaintiff stated he does "[his] share" of the vacuuming, sweeping, mopping, cooking, and laundry (Tr. 43). Plaintiff also indicated he has no hobbies besides watching Facebook videos on his phone and taking care of his dog (Tr. 43-44). Plaintiff stated he has "bad days" about half the time (Tr. 46). According to Plaintiff, up until recently he had been able to attend therapy in person, but he was still receiving counseling over the telephone (Tr. 46-47).

***Vocational expert testimony***

A vocational expert also testified at the hearing. The vocational expert described Plaintiff's previous work experience as a barber as light exertional level and an SVP of 6 (Tr. 48-49). The ALJ then presented the following hypothetical to the vocational expert:

> Let's assume a hypothetical individual of the claimant's age, education and with the work history just described. Further assume the individual can perform work at all exertion levels but with the following non-exertional limitations. The individual can understand, remember, and carry out detailed non-complex instruction. The

individual is limited to occasional interaction with supervisors. Within these parameters, would the individual be able to perform the past work?

(Tr. 49). The vocational expert stated there would be other jobs in the national economy the individual could perform (Tr. 49).[1] Specifically, the vocational expert listed kitchen helper, laundry laborer, and assembler motor vehicle (Tr. 49-50).

For the second hypothetical, the ALJ asked the vocational expert to further assume the hypothetical individual would be limited to the performance of simple routine tasks, simple work-related decision making, and occasional interaction with supervisors, coworkers, and the public (Tr. 50). The vocational expert responded that the individual would not be able to perform his past work, but that the individual would still be able to perform jobs in the national economy (Tr. 50). The vocational expert listed battery stacker, laundry laborer, and assembler motor vehicle as three medium exertion jobs the individual could perform in the national economy (Tr. 50-51).

Finally, Plaintiff's attorney asked the vocational expert to assume the hypothetical individual would be absent from work four days a month on an ongoing basis and asked how that would affect his ability to retain a job (Tr. 53). The vocational expert indicated that absenteeism of that frequency would eliminate all jobs within the national economy (Tr. 53).

## APPLICABLE LAW

### *Standard of review*

In an appeal under § 405(g), the Court must review the Commissioner's decision to determine whether there is substantial evidence in the record to support the Commissioner's factual findings and whether the Commissioner applied the proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). Substantial

---

[1] Although the vocational expert initially indicated the individual would be able to perform previous work (Tr. 49), he realized he was mistaken on cross examination (Tr. 52).

evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner, *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995), and conflicts in the evidence are resolved by the Commissioner, *Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985).

### *Entitlement to benefits*

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *Plaisance v. U.S. Comm'r, SSA*, No. 6:18-CV-00033, 2019 WL 2608884, at *14 (W.D. La. May 13, 2019), *report and recommendation adopted sub nom. Plaisance v. U.S. Comm'r*, No. 6:18-CV-00033, 2019 WL 2607498 (W.D. La. June 25, 2019) (citing 42 U.S.C. § 423(a)). The Supplemental Security Income ("SSI") program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(a)(1) & (2)).

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(c)(a)(3)(A)). A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives,

whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(c)(a)(3)(B)).

### Sequential evaluation process and burden of proof

Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations that establish a five-step process to determine whether a claimant suffers from a disability. 20 C.F.R. § 404.1520 (2012). First, a claimant who, at the time of his disability claim, is engaged in substantial gainful employment is not disabled. 20 C.F.R. § 404.1520(a)(4)(i) (2012). Second, the claimant is not disabled if his alleged impairment is not severe, without consideration of his residual functional capacity, age, education, or work experience. 20 C.F.R. § 404.1520(a)(4)(ii) (2012). Third, if the alleged impairment is severe, the claimant is considered disabled if his impairment corresponds to a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1 (2011). 20 C.F.R. § 404.1520(a)(4)(iii) (2012). Fourth, a claimant with a severe impairment that does not correspond to a listed impairment is not considered disabled if he is capable of performing his past work. 20 C.F.R. § 404.1520(a)(4)(iv) (2012). Finally, a claimant who cannot return to his past work is not disabled if he has the residual functional capacity to engage in work available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v) (2012). If, at any step, the claimant is determined to be disabled or not disabled, the inquiry is terminated. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (citing *Lovelace v. Bowen,* 813 F.2d 55, 58 (5th Cir. 1987)).

Under the first four steps of the sequential analysis, the burden lies with the claimant to prove disability. *Audler,* 501 F.3d at 448. If the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant can perform. *Greenspan*, 38 F.3d

at 236. This burden may be satisfied either by reference to the Medical–Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen,* 810 F.2d 1296, 1304 (5th Cir. 1987). However, this process is used only when an initial determination of disability is being evaluated, not when a claimant is already receiving disability benefits. *See* 20 C.F.R. § 404.1520(a)(5). The Code explicitly states, "If you are already receiving disability benefits, we will use a different sequential evaluation process to decide whether you continue to be disabled. We explain this process in § 404.1594(f)." *Id.*

## THE ALJ'S FINDINGS AND CONCLUSIONS

As a threshold matter, the ALJ found that Plaintiff met the insured status requirements of the Act through September 30, 2023 (Tr. 15, Finding 1). The ALJ found Plaintiff had not engaged in substantial gainful activity since September 1, 2018, the alleged onset date (Tr. 15, Finding 2). The ALJ found Plaintiff had the following severe impairments: bipolar disorder, Hepatitis C, hypertension, obesity, and cocaine abuse (in remission) (Tr. 15, Finding 3). However, Plaintiff did not have an impairment or combination of impairments that met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926) (Tr. 15-17, Finding 4).

Next, the ALJ determined that Plaintiff had the residual functional capacity for medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) with certain limitations (Tr. 17-22, Finding 5). Specifically, the ALJ found that Plaintiff can perform simple, routine tasks; perform simple work-related decisions; and interact with supervisors, coworkers, and the public on an occasional basis (Tr. 17).

At step four in the sequential evaluation process, the ALJ determined that Plaintiff was unable to perform any past relevant work (Tr. 22, Finding 6). At step five, upon consideration of

Plaintiff's age, education, work experience, residual functional capacity, and the vocational expert's testimony, the ALJ found Plaintiff could perform other jobs existing in significant numbers in the national economy (laundry laborer, assembler motor vehicles, and battery stacker) (Tr. 22-23, Finding 10). Accordingly, the ALJ found Plaintiff was not under a disability, as defined in the Act, from September 1, 2018, the alleged onset date, through the date of the ALJ's decision (Tr. 23, Finding 11).

## ANALYSIS

"The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). Substantial evidence is a term of art used to describe how courts are to review agency fact finding. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Under the substantial-evidence standard, a court looks to the existing administrative record to determine whether it contains sufficient evidence to support the agency's factual determinations. *Id.* Although "substantial" has a different meaning in other contexts, the threshold of sufficient evidence to satisfy the substantial evidence standard "is not high." *Id.* Substantial evidence requires more than a mere scintilla of evidence, but it "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*.

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, a claimant also bears the burden of showing any alleged error of law was prejudicial because the Supreme Court has recognized the doctrine

of harmless error applies to administrative determinations, and the Fifth Circuit has specifically held it will not vacate a judgment unless the substantial rights of a party are affected. *See Shinseki v. Sanders*, 556 U.S. 396, 407-08 (2009); *Jones v. Astrue*, 691 F.3d 730, 734 (5th Cir. 2012); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

The overarching issues are whether substantial evidence of record supports the Commissioner's decision that Plaintiff was not disabled during the relevant period, and whether the ALJ applied the correct legal standards in reaching that decision. Having reviewed the parties' briefs, the Court notes the following specific issues on appeal: (1) whether the ALJ erred at step three in evaluating whether Plaintiff meets the criteria of Listings 12.03, 12.04, 12.06, 12.07, 12.08, and 12.15; (2) whether the ALJ's residual functional capacity assessment is supported by substantial evidence; and (3) whether the ALJ erred in evaluating the opinions of consulting examiner, James Davis, Psy.D., and treating source, Diane Thomas, M.S. Dkt. No. 13 at 1.

The ALJ here found multiple severe impairments in step two, and so she properly proceeded to step three. In considering Plaintiff's presumptive disability under step three, the ALJ determined that the severity of Plaintiff's mental impairments, "considered singly and in combination, do not meet or medically equal the criteria of listing 12.04." Tr. 16.

In his first claim for relief, Plaintiff asserts the ALJ erred at step three. Plaintiff contends the record shows the severity of Plaintiff's mental impairments, considered singly and in combination, do meet or medically equal the criteria of Listing 12.04 (depressive, bipolar and related disorders), which the ALJ specifically addressed, as well as Listings 12.03 (schizophrenia spectrum and other psychotic disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.07 (somatic symptom and related disorders), 12.08 (personality and impulse-control disorders), and 12.15 (trauma- and stressor-related disorders), which the ALJ did not specifically address.

According to Plaintiff, it is "inexcusable for the ALJ to only consider Listing 12.04" and ignore the other Listings. Dkt. No. 13 at 14. Plaintiff asserts the record shows he has marked limitations in understanding, remembering and applying information and in concentration, persistence and pace as well as severe limitations in interacting with others and in adapting and managing oneself. *Id.* at 11.

Even though the ALJ did not specifically discuss any other mental listing other than Listing 12.04, the Commissioner asserts substantial evidence supports the ALJ's finding that Plaintiff did not have Listings-level impairment. The Commissioner argues the crucial factors applicable to each listing are generally the same as those the ALJ discussed in relation to Listing 12.04 or reflect limitations that Plaintiff does not satisfy. Dkt. No. 14 at 1. Additionally, the Commissioner asserts the Fifth Circuit does not require procedural perfection in administrative proceedings and holds that a court should not vacate a judgment unless the party's substantial rights have been affected. *Id*. at 6 (citing *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (the major policy underlying harmless error is to preserve judgments and avoid waste of time)).

During step three of the ALJ's analysis, "the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Kemp v. Kijakazi*, No. 4:22-CV-00231, 2023 WL 2249162, at *4 (S.D. Tex. Feb. 27, 2023), *report and recommendation adopted*, No. 4:22-CV-00231, 2023 WL 3035372 (S.D. Tex. Mar. 15, 2023) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990)). Each impairment's listing contains multiple paragraphs of criteria, described as paragraphs A, B, and C. *Id.* Generally, the criteria set forth in paragraph A outlines the medical diagnoses and symptoms that must be present in the record. *Id.* (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1). Paragraphs B and C outline "impairment-related functional limitations that are incompatible with the ability to do any gainful activity." *Id.*

(quoting *McGowan v. Saul*, 2021 WL 799325, at *3 (S.D. Tex. Jan. 6, 2021) (quoting *Willingham v. Comm'r of Soc. Sec. Admin.*, 2014 WL 1050286, at *3 n.3 (E.D. Tex. Mar. 14, 2014)), *report and recommendation adopted*, 2021 WL 951859 (S.D. Tex. Mar. 10, 2021)). A claimant is presumptively disabled if she shows that she meets requirements of paragraphs A and B or paragraphs A and C. *Id.* (citations omitted).

Paragraph B is the same for all at-issue listings, and paragraph C is the same for all at-issue listings that contain a paragraph C. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.03, 12.04, 12.06, 12.07, 12.08, and 12.15; *see also Kemp*, 2023 WL 2249162, at *3-4. Specifically, paragraph B tasks the ALJ with deciding whether Plaintiff has one "extreme" limitation or two or more "marked" limitations of the four areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* Paragraph C of listings 12.03, 12.04, 12.06, and 12.15 provides the criteria used to evaluate serious and persistent mental disorders. To satisfy the paragraph C criteria, there must be a medically documented history of the disorder over a period of at least two years and evidence of both:

> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
>
> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

*Id*. §§ 12.03(C), 12.04(C), 12.06(C), 12.15(C).

The ALJ did not describe the medical criteria set forth in paragraph A of any of the listings, including Listing 12.04 for depressive, bipolar and related disorders. The ALJ addressed only paragraphs B and C of Listing 12.04, presumably because Plaintiff's ability to satisfy paragraph

A's requirements alone would be insufficient if he could not also satisfy one of the latter. The ALJ found that Plaintiff's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, and therefore, the "paragraph B" criteria were not satisfied (Tr. 16-17).

The ALJ's analysis of the "paragraph B" criteria ended with a statement that the ALJ had also considered whether the "paragraph C" criteria were satisfied and that the evidence failed to establish the presence of the "paragraph C" criteria (Tr. 17). According to the ALJ, the record does not establish that Plaintiff has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of Plaintiff's daily life (Tr. 17).

The Court finds the ALJ properly analyzed the mental impairment listings as an aggregate because the listing for 12.04 and Listings 12.03, 12.06  12.07, 12.08, and 12.15 share the same criteria for paragraphs B and C (for those listings that contain a paragraph C). Thus, if substantial evidence supports the ALJ's findings that Plaintiff did not satisfy the paragraph B or C criteria for Listing 12.04, those findings also would foreclose Plaintiff's reliance on the other listings. *See Kemp*, 2023 WL 2249162, at *4. As reflected in the ALJ's discussion, Plaintiff failed to establish that his impairments met or equaled the paragraph B or paragraph C criteria, which are identical for Listings 12.03, 12.04, 12.06 and 12.15. Tr. 13-14; 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.03(B)-(C), 12.04(B)-(C), 12.06(B)-(C), 12.15(B)-(C).

The ALJ found that Plaintiff experienced only "moderate" or "mild" limitations in each of the four "part B" criteria measures – and, as such, Plaintiff did not meet paragraph B's criteria of having two markedly limited categories or one extremely limited category. In understanding, remembering, or applying information, the ALJ found that Plaintiff had "mild" limitations (Tr. 16). Plaintiff alleged he has difficulty following instructions and completing tasks (Tr. 16).

However, the ALJ noted the record shows that Plaintiff was able to comply with treatment outside of a doctor's office or hospital, as he reported compliance with Hepatitis C treatment, as well as mental health treatment (Tr. 16). Moreover, the ALJ noted that Plaintiff's cognitive function has been intact, which is demonstrated throughout the record (Tr. 16, 422, 426, 620, 624, 638).

The ALJ found that Plaintiff also had no more than "moderate" limitations in the area of interacting with others (Tr. 16). Plaintiff alleged he has difficulty engaging in social activities, getting along with others, and spending time in crowds, and that he did not like to leave his home (Tr. 16, 260, 311, 319). However, according to his statements, Plaintiff is also able to live with others (Tr. 525, 535, 540, 543, 722, 730), and he drives no more than twice a week (Tr. 16, 36, 257). The medical evidence also shows that the claimant had a good rapport with providers, was described as pleasant and cooperative (Tr. 362, 375, 422, 425, 426, 429, 435, 439, 619, 620, 624, 637, 638, 711, 712, 886, 1013), had good interactions with non-medical staff, and appeared comfortable during appointments (Tr. 16). The ALJ also noted that "[t]here were no indication of abnormal and/or adverse behavior upon examinations." (Tr. 16).

Regarding Plaintiff's ability to concentrate, persist, or maintain pace, the ALJ found that Plaintiff had "moderate" limitations (Tr. 16-17). Plaintiff contended he has more severe limitations in concentrating, focusing, following instructions, and completing tasks (Tr. 16). However, Plaintiff noted that his medication helps him to concentrate better (Tr. 16, 490, 492, 561, 563, 647). The ALJ further noted that "upon mental status examinations, there were no gross deficits with cognition, attention, or concentration," which is demonstrated in the record (Tr. 17, 658, 678, 724, 733, 775, 905, 951, 1030).

The ALJ also found that Plaintiff had "mild" limitations in his ability to adapt or manage himself (Tr. 17). Plaintiff asserted that he has difficulties handling change and managing his mood

(Tr. 17, 260). Although Plaintiff said he needed reminders to tend to personal care and for medications, objective evidence in the record showed Plaintiff to have normal mood and affect on several occasions throughout the record (Tr. 17, 447, 463, 475, 479, 577, 581, 587). The ALJ also noted that Plaintiff has not presented with abnormal behaviors upon examinations (Tr. 17).

Plaintiff identifies one evaluation from a treating source and one evaluation from a consultative examiner that identify more severe limitations. Specifically, Plaintiff relies on the December 11, 2019 Mental Treating Source Statement from Diana Thomas, M.S., QNHP II, wherein Ms. Thomas found Plaintiff had marked and extreme limitations as follows:

A.  Understanding and Memory:

Understand and remember very short, simple instructions: **Marked**

B.  Concentration and Persistence:

Maintain attention and concentration for extend periods: **Extreme**

Sustain an ordinary routine without special supervision: **Marked**

Complex a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: **Marked**

C. Social Interaction:

Interact appropriately with the general public: **Extreme**

Ask simple questions or request assistance: **Marked**

Accept instructions and respond appropriately to criticism from supervisors: **Extreme**

Get along with coworkers or peers without distracting them or exhibiting behavioral extremes: **Extreme**

Maintain socially appropriate behavior and adhere to basis standards or neatness and cleanliness: **Extreme**

C.  Adaptation

Ability to respond appropriately to change in the work setting: **Extreme**

Ability to be aware of normal hazards and take appropriate precautions: **Marked**

Ability to travel in unfamiliar places or use public transportation: **Extreme**

Ability to set realistic goals or make realistic plans independently of others: **Extreme**

On the average, how often do you anticipate that your patient's impairments or treatment would cause your patient to be absent from work? **more than four days per month**

Remarks on above or other functional limitations:
**Ongoing symptoms moderately impair social and occupational functioning.**

(Tr. 608-09) (emphasis added).

Additionally, Plaintiff relies on the June 30, 2021 psychological evaluation by consultative examiner, James P. David Psy.D. (Tr. 1013-23). Plaintiff reported auditory hallucinations, a history of suicidal thinking since childhood, and one prior serious suicide attempt (Tr. 1016). Plaintiff presented with depressed mood and dysthymic affect with low average intelligence, but he was able to calculate mental math accurately and appeared to have some, limited insight (Tr. 1016). After testing, Plaintiff scored average in quantitative reasoning, borderline delayed for nonverbal IQ and working memory, and low average in all other areas (Tr. 1017). Plaintiff was diagnosed with schizoaffective disorder, bipolar type; post-traumatic stress disorder; severe cocaine use disorder in remission three years; panic disorder with agoraphobia; and specific learning disorder with impairment in written language (Tr. 1018). Dr. David noted Plaintiff's symptoms were "quite severe, persistent, and have had only limited response to medication management." (Tr. 1019). According to Dr. David, Plaintiff's level of paranoia and psychosis severely impair him in any work environment, noting Plaintiff rarely left the house dur to panic and agoraphobia (Tr. 1019). Regarding functional capacity, Dr. David opined Plaintiff had moderate impairment in his ability to understand, carry out, and remember instructions; moderate

to severe impairment in his ability to sustain concentration and persist in work related activities at a reasonable pace; and a severe impairment in his ability to (1) maintain effective social interaction on a consistent and independent basis with supervisors, coworkers and the public and (2) deal with normal pressure in a competitive work setting (Tr. 1019).

Dr. David also completed a Medical Source Statement of Ability to do Work Related Activities (Mental) that showed marked limitations in Plaintiff's ability to: (1) understand and remember computer instructions; (2) carry out complex instructions; and (3) make judgments on complex work-related decisions; (4) interact appropriately with the public and co-workers; and (5) respond appropriately to usual work situations and to changes in a routine work setting (Tr. 1020-21). Dr. David opined Plaintiff has an extreme limitation in his ability to interact appropriately with supervisors (Tr. 1021). According to Dr. David, Plaintiff's ongoing psychosis/paranoia impairs his judgment; he scores low on working memory and has a hard time following through on complex tasks; he now shows signs of agoraphobia and panic attacks; and he cannot tolerate working with others (Tr. 1020-21).

To establish that a claimant's injuries meet or medically equal a listing, the claimant must provide medical findings that support all of the criteria for a listed impairment (or most similarly listed impairment). *Thedford v. Saul*, Civil Action No. 3:19-CV-1120, 2020 WL 4723062, at *7 (W.D. La. May 19, 2020), *report and recommendation adopted*, No. CV 19-1120, 2020 WL 4724240 (W.D. La. Aug. 13, 2020) (citing *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990)). In determining whether a claimant's impairment(s) equals a listing, all evidence in the case record about the claimant's impairments and their effects are considered. 20 C.F.R. § 404.1526(c). An impairment that manifests only some of the requisite criteria, no matter how severely, does not qualify. *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990)). If the plaintiff

fails to demonstrate the specified medical criteria, the court will find that substantial evidence supports the ALJ's finding that listings-level impairments are not present. *Id.* (citing *Selders*, 914 F.2d at 620).

At step three of the sequential evaluation process, the burden remains on Plaintiff to establish that his impairment meets or equals an impairment enumerated in the listings, not upon the Commissioner to prove that Plaintiff does not satisfy a listing. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The determination of whether a claimant meets or equals the requirements of any impairment in the Appendix 1 Listing of Impairments is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

With regard to medical opinions in general, "[t]he ALJ as factfinder has the sole responsibility for weighing evidence and may choose whichever physician's diagnosis is most supported by the record." *Muse*, 925 F.2d at 790 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). Weighing the evidence and determining the relative weight to be given to the pieces of evidence is reserved for the ALJ. *Chambliss v. Massanari*, 269 F.3d 520, 523 (5th Cir. 2001); *Gray v. Astrue*, Civil Action No. 1:09- CV-0101-BI, 2011 WL 856941, at *5-6 (N.D. Tex. Mar. 11, 2011) (unpublished). The ALJ has considerable discretion in assigning weight to medical opinions and may reject the opinion of a physician when the evidence supports a contrary conclusion. *Newton v. Apfel*, 209 F.3d 448, 455-56. (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).

Here, Plaintiff has not shown that the ALJ erred in concluding Plaintiff failed to demonstrate that he experiences two "marked" or one "extreme" limitation in the paragraph B criteria. Although the ALJ did not discuss the opinions of Dr. David and Ms. Thomas at step three,

the ALJ sufficiently discussed substantial evidence in the record which supports the ALJ's step three findings and sufficiently explained why she found Plaintiff not to be disabled at that step. Additionally, the ALJ's finding that the paragraph C criteria were not met is supported by the evidence of record discussed above (Tr. 17). Given the totality of the evidence, which reflects no history of repeated decompensation, marginal adjustment, or an inability to function outside a highly structured living arrangement, substantial evidence supports the ALJ's determination that Plaintiff does not have a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life (Tr. 17). Plaintiff has not established that he satisfies all the criteria for a mental listing, including Listings 12.03, 12.04, 12.06, 12.07, 12.08, and 12.15.

What is more, the Commissioner persuasively asserts the any error at step three is harmless because Plaintiff cannot show the requisite functional loss. Specifically, the Commissioner points out that the ALJ, in assessing Plaintiff's residual functional capacity, did not find persuasive the two opinions relied upon by Plaintiff, noting they were both contradicted by normal medical findings throughout the record. Dkt. No. 14 at 1. This argument, along with Plaintiff's two additional claims of error, requires the Court to consider the ALJ's RFC analysis.

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. *Scott C. P. v. Berryhill*, No. 3:18-CV-00036-D-BH, 2019 WL 1318365, at *11 (N.D. Tex. Feb. 26, 2019), *report and recommendation adopted*, No. 3:18-CV-0036-D, 2019 WL 1315894 (N.D. Tex. Mar. 22, 2019) (citing 20 C.F.R. § 404.1545(a)(1)). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *Scott*, 2019 WL 1318365, at *11 (quoting Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996)). An individual's residual functional capacity should be based on all of the relevant evidence in the case

record, including opinions submitted by treating physicians or other acceptable medical sources. *Id*. (citing 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1).

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's residual functional capacity decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994).

A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Jodie C. v. Berryhill,* Civil Action No. 3:18-CV-1687-S-BH, 2019 WL 3101689, at *16 (N.D. Tex. May 7, 2019), *report and recommendation adopted*, No. 3:18-CV-1687-S, 2019 WL 3081538 (N.D. Tex. July 15, 2019) (citation omitted).

As noted above, the ALJ determined that Plaintiff had the residual functional capacity for medium work with certain mental limitations (Tr. 17-22). Specifically, the ALJ found that Plaintiff can perform simple, routine tasks; perform simple work-related decisions; and interact with supervisors, coworkers, and the public on an occasional basis (Tr. 17).

Plaintiff contends the RFC assessment is in "direct conflict" with Dr. David's opinion that Plaintiff cannot "perform simple work-related decisions; and interact with supervisors, coworkers, and the public on an occasional basis." Dkt. No. 13 at 17. Relatedly, Plaintiff asserts the ALJ failed to properly consider the opinions of treating counselor, Ms. Thomas. *Id*. at 18-21. According to the Commissioner, the ALJ included mental restrictions in the residual functional capacity assessment but found the overall record did not support marked/extreme interpersonal limits as opined by Dr. David and Ms. Thomas. Dkt. No. 14 at 10, 14. The Commissioner further asserts the ALJ properly considered the medical opinions under the applicable regulatory guidelines.

As noted above, in her step three analysis of Listing 12.04, the ALJ did not address the opinions of Dr. David and Ms. Thomas. However, in her discussion of residual functional capacity, the ALJ addressed both opinions, finding them unpersuasive. The Social Security Administration has promulgated a new regulation regarding the evaluation of medical opinions that is applicable to claims filed on or after March 27, 2017. 20 C.F.R. § 404.1520c. Pursuant to the revised rules for evaluating medical opinions, the ALJ is no longer required to defer or give any specific evidentiary weight to any medical opinion or prior administrative finding. *Gena R. v. Comm'r of Soc. Sec.*, No. 4:21-CV-1352, 2022 WL 16924116, at *8 (S.D. Tex. Nov. 11, 2022) (citing 20 C.F.R. § 404.1520c(a)).

Instead, the ALJ is required to consider all medical opinions and prior administrative medical findings using specific factors: (1) supportability; (2) consistency; (3) the physician's

relationships with the claimant, which includes considering the length, purpose, and extent of the treatment relationship, the frequency of examinations, and the examining relationship; (4) the physician's specialization, and (5) other factors. *Id.* (citing 20 C.F.R. § 404.1520c(b)). The most important factors are consistency and supportability. *Id.* (citations omitted). Under the revised guidelines, the ALJ must articulate how persuasive he finds each of the opinions in the record based on the supportability and consistency factors. *Id.* (citing 20 C.F.R. § 404.1520c(b)).

The supportability factor evaluates how "relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)." *Id.* at *9 (quoting 20 C.F.R. § 416.920c(c)(1)). In other words, "supportability looks internally to the bases presented by the medical opinion itself." *Id.* (quoting *Sharon H. v. Kijakazi*, No. 5:21-CV-167-H, 2022 WL 3951488, at *3 (N.D. Tex. Aug. 31, 2022)). "In articulating how they considered the supportability factor, ALJs may note that the physician's own treatment notes do not support the physician's opinion, that the physician's opinion stems from a checklist, that the physician did not consider certain evidence, did not examine the claimant, or did or did not provide a detailed explanation for [their] opinion." *Id.* (quoting *Starman v. Kijakazi*, No. 2:20-CV-00035-SRC, 2021 WL 4459729, at *4 (E.D. Mo. Sept. 29, 2021) (citations omitted) (collecting sources)).

The ALJ found Ms. Thomas' December 11, 2019 opinions (namely, that Plaintiff had marked limitations in understanding and remembering very short instructions and asking simple questions and extreme limitations in accepting criticism, getting along with coworkers or peers, responding appropriately to changes in a work setting, and setting realistic goals or make realistic plans independently of others) had "only little persuasion." (Tr. 21). According to the ALJ, Ms. Thomas did not provide any documentation that supports her conclusion, and the conclusion was

not consistent with counseling notes that show primarily normal mental status examinations (Tr. 21). Ms. Thomas' "checklist opinion" was not supported by any narrative explanation. *See* Dkt. No. 14 at 14-15. And, as noted by the ALJ, counseling notes have overwhelmingly revealed normal mental status examinations. *Id*. at 14 (citing Tr. 545, 658, 678, 724, 733, 775, 905, 951, 968-69, 1030).

The ALJ also found unpersuasive the opinions of consultative examiner James David, Psy.D. In discounting Dr. David's opinion, the ALJ noted as follows:

> On June 30, 2021, James David, PsyD, examined the claimant on a consultative basis. The claimant reported ongoing psychosis and paranoia, which Dr. David stated impacts the claimant's judgment. Testing revealed low working memory and the claimant had difficulty following through on more complex tasks. Dr. David further noted that the claimant was now showing signs of agoraphobia and panic attacks. Therefore, he noted that the claimant could not tolerate working with others. Dr. David described the claimant's symptoms as quite severe, persistent, and have had only limited response to medication management. Dr. David's report is supportive of disability; however, limitations do not appear consistent with the overall medical evidence of record. (Exhibit B18F) The overall record does not support marked/extreme interpersonal limits. Of note, the claimant has repeatedly indicated that his medication, particularly Seroquel, has been beneficial. He repeatedly noted stable mood and a desire to receive disability. Counseling notes have overwhelmingly revealed normal mental status examinations, as previously discussed. Accordingly, Dr. David's opinion is not persuasive.

(Tr. 20).

In evaluating the medical opinion evidence and prior administrative findings, the ALJ properly noted that she would not defer or give any specific evidentiary weight, including controlling weight, to any prior administrative findings or medical opinions (Tr. 21). Instead, the ALJ evaluated the medical opinions and prior administrative findings in accordance with the requirements of 20 CFR 404.1520c. The ALJ articulated her reasons for rejecting the testimony of Dr. David (Tr. 20). As is required by Section 404.1520c, the ALJ considered both the consistency and supportability of Dr. David's opinions in light of other medical opinions and evidence in the

record, including the "generally positive" mental health records from Community Heathcore through April 2021 and the records which indicated that Plaintiff's medications had been beneficial and that Plaintiff's mood was stable. The ALJ recognized that while the evidence showed that Plaintiff subsequently experienced some challenges with anxiety, depression, and paranoia, Plaintiff's "condition has generally been controlled with medication, as he has noted on several occasions." (Tr. 20-21). Thus, the ALJ properly concluded that Dr. David's opinion of marked to extreme limitations was not consistent with the record as a whole.

In sum, the Court finds the ALJ's decision is supported by the substantial evidence and is the product of the application of proper legal standards. Even though the ALJ found unpersuasive the medical opinions of Dr. David and Diane Thomas, M.S., regarding Plaintiff's mental limitations, "[t]he [revised] regulations do not prohibit the ALJ from assessing the claimant's RFC based on other record evidence when he finds all medical opinions to be unpersuasive." *Gena R.*, 2022 WL 16924116, at *11 (quoting *West v. Kijakazi*, No. H-21-2395, 2022 WL 4137297, at *6 (S.D. Tex. Aug. 26, 2022), *report and recommendation adopted*, No. CV H-21-2395, 2022 WL 4138574 (S.D. Tex. Sept. 12, 2022) (citing 20 C.F.R. §§ 404.1520c, 404.1545)). In such cases, the court's "inquiry focuses on whether the decision of the ALJ is supported by substantial evidence in the existing record." *Id.* (quoting *Kalka v. Kijakazi*, No. 6:21-CV-00087, 2022 WL 866409, at *1 (E.D. Tex. Mar. 23, 2022) (quoting *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)) (quotations removed in *Gena R*)).

Contrary to Plaintiff's assertion, substantial evidence supports the ALJ's residual functional capacity assessment. The State Agency consultants also performed the psychiatric review technique in evaluating Plaintiff's mental impairments. The ALJ took these findings into consideration and incorporated some of them, including that Plaintiff could understand, remember,

and carry out simple, non-complex instructions, interact appropriately with others, and adequately respond to others. The ALJ found these opinions persuasive, noting Plaintiff is treated with medication and counseling (Tr. 22). Although Plaintiff has presented as anxious, mental status examinations have been rather normal and his symptoms had been stable with medications. The Court finds the ALJ properly assessed Plaintiff's residual functional capacity consistent with the evidence as a whole.

## **<u>RECOMMENDATION</u>**

"The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot fund substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Legget v. Chater*, 67 F.3d 558, 565-66 (5th Cir. 1995). Having reviewed the record, the Court determines the record shows that the Administration correctly applied the applicable legal standards and that substantial evidence supports the Administration's determination that Plaintiff is not disabled. Accordingly, it is

**RECOMMENDED** the above-entitled Social Security action be **AFFIRMED**.

### Objections

Within fourteen (14) days after service of the Magistrate Judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Ass'n*., 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

SIGNED this the 2nd day of August, 2023.

J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE